Gannon v. Moles.

---

### Bridget Gannon v. Fred R. Moles and Jacob Haish.

#### Gen. No. 4232.

1. DECREE—*when not disturbed.* A decree will not be reversed as contrary to the evidence, unless it appears that the findings of the chancellor are clearly and palpably wrong.

Bill in equity, seeking to redeem from an alleged constructive mortgage. Appeal from the Circuit Court of Kane County; the Hon. CHARLES A. BISHOP, Judge, presiding. Heard in this court at the April term, 1903. Affirmed. Opinion filed October 23, 1903.

JONES & ROGERS and J. E. MATTESON, for appellant.

D. B. SHERWOOD, for appellee Moles.

MR. JUSTICE FARMER delivered the opinion of the court.

This was a bill by Bridget Gannon against Fred R. Moles and Jacob Haish in the Circuit Court of Kane County for the redemption of certain lands therein described. The land was a farm of 220 acres in Kane County, and the bill alleges that on the 14th day of October, 1893, complainant being indebted to defendant, Jacob Haish, in the sum of $5,830.68, conveyed the land by a deed absolute on its face but in fact to secure the payment of said sum with interest at seven per cent per annum on or before two years from that date. That afterward Haish called upon complainant for payment of the amount due him and she thereupon applied to defendant Fred R. Moles, who was her son-in-law, to furnish her money to make the payment, and also loan her $3,000 at seven per cent interest, which he did, and to secure the payment of these sums to Moles she, on January 12, 1895, caused Haish to convey the land to him by a deed, absolute in form but which the bill charges was in fact but a mortgage and was so intended and understood by all the parties to the transaction. The bill further alleges that upon the payment to Moles of the amount he had paid Haish and the sum loaned complainant, he was to reconvey the lands to complainant, and that immediately upon the deed being made to Moles he took possession of the land and has retained it ever since. That in August, 1899, complainant offered to pay Moles the amount due him, by virtue of their agreement, less the rents and profits received by him from the farm, but that he refused to accept payment and refused to reconvey the land to complainant and denied that he held the title as security, but claimed he had purchased the farm and was the absolute owner thereof. Complainant in her bill averred she was ready and willing to pay Moles the amount due him and prayed that an account be taken of the principal and interest of her indebtedness to Moles and of the rents and profits of the lands during the time they were in his possession, that such rents and profits be credited upon complainant's indebtedness and

that a decree be entered that upon the payment, by complainant, of the amount due Moles after deducting the rents that he reconvey to complainant said land and deliver up to her the possession thereof.

Moles answered the bill denying he held the title as security or that the deed was made to him for any such purpose, but averred that he purchased the land from complainant for $12,000, and paid the full consideration for said purchase by paying complainant's indebtedness to Haish, for which he held the title as security, amounting to $8,661.58, and at complainant's request giving her two sons, E. L. and W. P. Gannon, his notes for $3,000 and paying them in cash $338.42. The answer denied all right of complainant to the relief prayed for in her bill or any part thereof.

Defendant, Jacob Haish, was defaulted. On the hearing, the court found that Moles did not hold the title as security, that he never executed any agreement or paper to that effect, that he was an absolute purchaser, had paid the full consideration which was the fair cash value of the land, and dismissed the bill at complainant's costs, and she appeals.

The principal question for our determination is, was the evidence sufficient to authorize a decree in complainant's favor? There was much conflict in the testimony and we will not undertake to set it out fully but will refer to the most important features of it. That complainant applied to Moles to furnish the money to pay her indebtedness to Haish is not controverted, nor that Haish held the title to the land merely as security. At the time complainant made the deed to him, he gave her an acknowledgment in writing that he held the title as security and would reconvey to her upon the payment of the amount due him. The controversy is, as to whether she sold Moles the land to raise the money for Haish and to save to herself the value of her equity, or whether she borrowed the money from him and had the title conveyed to him as security. It appears from the evidence that, at Mrs. Gannon's request, Moles met her and her two sons, Edward and William, at Haish's bank in DeKalb, January 11, 1895, for the purpose

of settling her indebtedness to Haish, Moles furnishing the money for that purpose. Mrs. Gannon took with her, also to assist in the settlement, her attorney, Judge Botsford. They were two days in effecting the settlement. It was ascertained that Mrs. Gannon owed Haish $8,661.58. Moles gave him a certified check for $2,661.58 of this amount and gave his notes for the remaining $6,000 secured by a mortgage on the land in controversy. At the same time he paid complainant's sons $338.42 and gave them his notes for $3,000, which were afterward paid. It appears Mrs. Gannon claims she owed her sons and had assigned them the agreement she held from Haish to reconvey as a kind of second mortgage to secure the payment. At the time of this settlement, another son of Mrs. Gannon, Thomas, had a judgment against her in the Circuit Court of Kane County, and to protect Moles against having the land subjected to the payment of said judgment, the notes to the Gannon boys were placed in Judge Botsford's hands to hold until the matter was settled. Haish, upon receiving payment, at Mrs. Gannon's request and direction, conveyed the land by deed to Moles. Edward and William Gannon, also, then and there assigned and transferred to Moles the written agreement from Haish to reconvey to their mother.

Mrs. Gannon and her two sons testified at the trial that after the settlement at Haish's bank was completed and all papers drawn and executed, William Gannon said to Moles that he thought his mother ought to have something to show that she was to have the farm back when she paid him the money he had advanced, with interest; that Moles said he was willing she should have something of that kind and then and there, himself, wrote and signed a statement to that effect, read it over to Mrs. Gannon and then handed it to her son Edward to read. That after he read it he said to his mother she had better keep it, but she told him to give it to Moles and let him keep it with the rest of the papers, which he did. They each testified to their recollection of the substance of the writing and that it was an agreement by Moles that upon complainant paying him the

money he had advanced for her he would convey the farm back to her.

John Stewart testified, that three or four years before the trial—which was had in January, 1903,—complainant applied to him for a loan on the farm if she could get it back from Moles and at her request he wrote Mr. Moles about it. The letter was introduced and the substance of it was, that Mrs. Gannon had asked him to assist her to save her farm; that it would require her to raise $12,000 to do so; that she had $1,000 and wanted to borrow $11,000 of the witness. Mr. Moles' reply to this letter was introduced by complainant, in which he said he did not see how Mrs. Gannon could figure she could make anything by getting the farm back; that he purchased it under protest after Mrs. Gannon had pleaded with him to do so to save her equity in it; that he paid $12,000 for it and had since spent $1,250 in improvements, but that if Mrs. Gannon would repay him these sums he would convey her the land with the provision that she could not resell it, and stated that if Mrs. Gannon wished to do this she must close the deal immediately "as her option expired last Saturday."

Patrick Hennigan, a brother of complainant, testified that he was present at his sister's and heard a conversation between complainant and defendant, Moles, while the latter was in possession of the farm, and that complainant said "Fred, give me the farm back and I will put the boys on," to which he replied he would do so if she would pay him all he had been out.

Thomas Fitzgerald testified that Moles said to him if Mrs. Gannon and the boys would get together in regard to the farm and pay him what it had cost him, with interest, they could have it.

This was substantially the proof on the part of complainant except as to the value of the land.

Mr. Moles testified that he bought the land outright and at complainant's request, in order to save her the value of her equity, and positively denies that he ever agreed to hold the title simply as security or that he signed any paper to

that effect and says that the first time he ever heard of such a paper was when he heard it from the Gannons on the witness stand. He testified that Mrs. Gannon told him she had to sell the farm, as Mr. Haish wanted his money and was going to foreclose, and asked him to buy it, that he told her he did not want to buy it and would try to get Mr. Haish to give her more time, and thereupon wrote Haish and sent complainant a copy of the letter. He also at the same time wrote complainant explaining his plans to aid her and asked her to show her letter to her sons, saying "if they are not satisfied I don't want to take the farm, and in fact it is only an accommodation to you that I go into it." He explained to her that his plan was, if Haish really wanted the farm, her sons could tell him she had another purchaser and "he (Haish) might decide to pay you more than what I have offered you. And I will endeavor to get him to buy the place if possible, and I will instruct Botsford accordingly." In the letter Moles wrote Haish, a copy of which he testifies he sent complainant, he stated he could get a purchaser for the farm, but the purchaser would want five years time on $6,000 and asked Haish if he could make the loan.

Defendant also introduced in evidence a letter from complainant to her daughter, Mrs. Moles, dated January 3, 1895, in which she said, "Fred can take it at $12,000 and our blessing and I want him to take it at once as I would be crazy before a month." Also another letter from complainant to her daughter, dated January 7, 1895, in which among other things she said, "Here is a letter I got to-day from Ranstead. He can't loan now but $7,000 so I want ye to get the rest and not let Tom have it. * * * Katie for God's sake let ye not let your mother and father's grand home go to the stranger or the black rip Nora. So don't think but you are making money by buying that farm that has everything on it, nothing wanted on it, good fences and the buildings are the best in the township, as Tom Brown said yesterday to Tom Conley that when he gets better farm, that the same buildings that's on our farm it will be $75 an acre to him, he said he knew that."

Gannon v. Moles.

Judge Botsford testified that he had been complainant's attorney and adviser for several years and had been informed by her of her indebtedness to Haish; that for ten years he had advised her concerning her farm matters; that he advised her to sell the land but she was disinclined to do so as she wanted to save it for her sons, but when Haish began pressing for payment complainant was worried and distressed and witness again advised her to sell and afterward she informed him she was trying to do so. The first knowledge the witness had of what disposition she had decided to make of the farm was when, at her request, he went with her to DeKalb to make the settlement with Haish. The witness says it is difficult to state the conversation between the parties, that there was a great deal of it, but it was to the effect that Moles had agreed to purchase the farm for a certain amount and was to take up the Haish indebtedness as a part of the consideration. Two days were consumed in making the settlement and completing the transaction. The result was that Haish made Moles a deed to the land and Moles paid complainant's indebtedness to him and gave each of complainant's sons a note for $1,000, and the two of them jointly another note for $1,000 and gave them his checks for something over $300, making the total $12,000. Afterward Thomas Gannon filed a creditor's bill to subject the land to the payment of his judgment. This suit was subsequently settled by the payment of $500. Judge Botsford notified the Gannon boys of the proposed meeting at Geneva to settle the Thomas Gannon suit and requested them to be present. They did not attend the meeting but directed Botsford to turn the notes over to complainant, which he did. Moles paid the three Gannon notes by three certified checks, one for $1,500, one for $1,000, and one for $500. The $500 was turned over to Thomas Gannon's attorney in settlement of the suit and judgment against complainant, and $2,500 was paid to complainant by direction of her sons. This satisfied the notes Moles had given the Gannon boys. Complainant then asked Judge Botsford to loan for her $2,000

of the amount she received, but he declined to do so and recommended her to Judge Ranstead, and Judge Botsford testifies that she afterward told him she had given the money to Judge Ranstead to loan for her. Judge Botsford further testified that as complainant's attorney he was present throughout the transaction at Haish's bank in DeKalb when the settlement was made and the deed executed to Moles and prepared the papers there executed, and at the conclusion of the matter separated and delivered to the respective parties the papers belonging to them, and that he never prepared, nor was asked to prepare, any such paper as the Gannons testified was signed by Moles, and that he never heard any talk between the parties about Moles holding the title as security and reconveying, when he was repaid, the money he had advanced and did not know any such agreement was claimed to exist until he learned it at the trial.

Moles further testified that some time after the transaction had been closed, complainant, in a conversation he had with her, said she wanted the farm back and used some very unkind words toward him. That he replied to her he had tried to be fair with her and wanted her to be so with him, but rather than be the subject of her abuse, he would, while under no obligations to do so, let her have the farm back if she would pay him his money but that she must raise the money within a specified time, which he thinks was two weeks. This is his version of the conversation Patrick Hennigan testified about. As to the conversation Thomas Fitzgerald testified to having with Moles, he says he has no recollection of any such statements.

The foregoing is the substance of the testimony on both sides upon this question. Did it entitle complainant to a decree for the relief she asked, and did the court err in denying it?

The cause was heard upon the testimony of the witnesses in open court. It will be seen that in essential and material parts the evidence was in hopeless and irreconcilable conflict. It has been repeatedly held by both the Supreme and

Appellate Courts of this State that to justify a reversal of a decree in chancery on the ground that it was contrary to the evidence, the findings of the chancellor must be clearly and palpably wrong. Schoonmaker v. Plummer, 139 Ill. 612; Metcalfe v. Bradshaw, 145 Ill. 124; Patterson v. Scott, 142 Ill. 138; Coari v. Olsen, 91 Ill. 273. In Schoonmaker v. Plummer *supra*, it is said, "As their testimony as well as that of other witnesses, was delivered in open court, the court below had an opportunity to see and hear them testify, and was accordingly in a much better position to judge of their relative credibility than we can be. A strong presumption is thus raised in favor of the findings of the decree, so far as they relate to questions upon which the evidence is conflicting, and that presumption must prevail, unless we are able to see that said court was clearly and manifestly in error."

After a careful consideration of the evidence we not only can not say that the court's finding of the facts was clearly and palpably wrong but on the contrary our own judgment approves it.

There is to our minds nothing in this record that would authorize the conclusion from all that occurred between the parties prior to the meeting in DeKalb, January 11th, that they met for the purpose of Moles loaning complainant the money to pay her indebtedness and hold the land as security for the repayment by complainant of the sum he thus advanced her. It is true, complainant wanted to keep the farm and doubtless would have done so had she been able to pay Haish and relieve it from the incumbrance. When, however, Haish pressed for his money and threatened to foreclose she appealed to defendant, her son-in-law, through her daughter, his wife. These letters we can understand in no other light than urgent appeals to defendant to buy the land. In none of these communications is the subject of Moles loaning the money to pay Haish and taking the title to the farm as security mentioned or hinted at. The farm was worth more than the Haish indebtedness. The equity in it belonged to her subject to the assign-

ment to her two sons and she applied to her son-in-law, as
we understand the evidence, to buy the land and thus pre-
vent its being taken from her by foreclosure proceedings.
Complainant testified that on the train going to DeKalb
defendant agreed to advance the money upon Haish mak-
ing him a deed and to reconvey to her when she repaid
him. This he denies. It is insisted that the testimony of
Hennigan, Fitzgerald, and the letter from Moles to Stewart
corroborate complainant and tend to show defendant held
the title as security. This testimony nowhere shows any
recognition of complainant's right to the land by Moles
and in our minds more reasonably harmonizes with his posi-
tion than with complainant's. It would be very strange if
the arrangement between complainant and Moles was as
she claims, that throughout the entire two days they were
engaged in making the settlement with Haish, Judge Bots-
ford, complainant's attorney employed by her to assist in
the transaction, heard nothing of any such agreement but
understood Moles was buying the land. Nor does it seem
probable, with Judge Botsford present to prepare the papers
to be executed between the parties, that he should not be
asked to prepare so important a document expressive of the
agreement between them but that it should be left to Moles
to draw it himself. Moreover, if complainant and her sons
thought it important that such an instrument should be exe-
cuted it would be most unreasonable to suppose they would
entrust it to Moles for safe keeping. It would seem also a
little singular that according to the testimony of all three
of the Gannons. the agreement made no mention of the
amount complainant was to pay Moles, although the amount
he had advanced was well known, nor did it mention any
time in which the payment was to be made. The Gannons
testify that Judge Botsford had passed out of the room
where they and Moles were, to the front of the bank when
the document was written by defendant and signed. Judge
Botsford testified that he has no recollection of being out
of the room at the time the Gannons claim the paper was
talked of and prepared, and can not state positively, but

Gannon v. Moles.

thinks he was not. He was present when everything he knew of was done, and at the conclusion of the transaction distributed the various papers to the respective parties and left with all the parties for the train to return to their homes.

It is also worthy of notice that while the bill alleges that it was agreed between complainant and defendant that the deed from Haish to defendant was for the purpose of vesting title in him to hold as security for the money he had advanced, it is nowhere stated that such agreement was in writing, nor is any such paper as the Gannons testified to mentioned or referred to in the bill. The decree finds, and we think not unwarrantedly, that the $12,000 paid by Moles was the fair value of the land at that time, and in view of all the evidence we are unable to say that the court erred in dismissing complainant's bill. It is insisted as a matter of law that as Haish's title was that of a mortgagee, Moles necessarily took title as a mortgagee also. We do not think this correct. If all the parties interested agree that Moles should become the absolute owner of the land, and if the deed from Haish and the assignment to him of the agreement from Haish to reconvey were intended to vest in him the legal and equitable title, we think what was done had that effect. Complainant and her sons, the only persons besides Haish having any interest in the land, requested and procured the deed to be made to Moles, he paying the full consideration thereof, and her two sons also with her knowledge and consent, assigned and transferred to Moles the agreement from Haish to reconvey, thus vesting in him absolute title, and having done this she can not now be heard to repudiate it. The decree is affirmed.

*Affirmed.*